APPEAL OF THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY FROM AN ORDER OF THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEW LONDON.

Second Judicial District, Norwich, April Term, 1908.
BALDWIN, C. J., HAMERSLEY, HALL, PRENTICE and THAYER, Js.

The general rule of policy in Connecticut from colonial times has been that towns, cities, and boroughs shall be charged with the burden of maintaining highways and given the power of protecting the public in their use.

Chapter 219 of the General Statutes, §§ 3903–3916, and especially § 3905, gives full direction and control over the use of highways by telegraph, telephone, and electric light or power companies to municipal authorities, including the power to direct any telegraph, telephone, or electric light company, and any company engaged in using electric wires or conductors, to place under ground such wires or conductors as may be used within the limits of a highway.

Under § 3824 of the General Statutes, also, the placing of electric wires and conductors in a highway by a street-railway company, for the purpose of applying electricity as a motive power for the operation of its railway, is subject to the direction of the local municipal authority, which may direct that such wires and conductors shall be placed under ground or overhead.

The power given to the New York, New Haven and Hartford Railroad Company, in its charter, to construct and operate street railways, is given subject to all general laws governing the con-

struction of railways in highways; and the power to use highways in the transmission of electricity, given in the Special Laws of 1905, page 711, § 3, is only given subject to the provisions of § 3905 of the General Statutes, establishing the exclusive direction of the municipality in the mode of placing the wires and conductors for such transmission.

Municipal authorities, jointly with the railroad commissioners, are the agents of the State in the control of the use of highways for street railways, and the commissioners, in some particulars, exercise the control through original and exclusive action, and may exercise it in all particulars either through original or appellate and final action.

Municipal authorities, in the absence of action by the railroad commissioners, may exercise the full direction and control given by statute in respect to placing electric wires and conductors in the highways by a street-railway company for the purpose of transmitting and applying electricity as the motive power for operating its railway, subject, however, to final action of the railroad commissioners.

While the Superior Court does not possess legislative or administrative powers, its judicial power extends to the restraint of the unlawful exercise of legislative or administrative powers by executive officers, municipal councils, or administrative boards.

This power of the Superior Court has for many years been invoked by a peculiar and informal process called "appeal."

Attempts to confer by statute upon the Superior Court powers essentially legislative or administrative are inoperative.

Under §§ 3832 and 3834 of the General Statutes, with other sections relating to the same subject-matter, especially § 3905, any authorized action, as to any matter relating to street railways, taken by local municipal authorities may be retried and determined by the railroad commissioners.

One injured in his legal rights by unlawful action, either of a municipal board, or of the board of railroad commissioners, in the exercise of the specified administrative powers of such board, may apply to the Superior Court, or a judge thereof in chambers, by "appeal," for such relief as comes within the judicial power of the court, and this process runs against the municipal board when the injury results from the unlawful action of that board.

The New York, New Haven and Hartford Railroad Company, being a street-railway company, and desiring to transmit electricity from its power station north of New London to a substation in New London, where the electricity was to be used for its street-railway lines, applied to the common council of New London for their approval of the erection of a line of poles and overhead wires along and across certain streets of New London for such transmission of electricity. The common council denied the ap-

plication, on the ground that they "did not consider it safe to grant this petition unless the wires are placed under ground." The street-railway company appealed to a judge of the Superior Court, asking that the order of the common council be revoked, and said judge, upon hearing, revoked said order. The city of New London appealed to the Supreme Court of Errors, claiming, first, that the common council had power to make the order complained of, and second, that the Superior Court, or a judge thereof in chambers, could not entertain an application for determining such question of power before the subject-matter of the order had been passed upon by the railroad commissioners. *Held* that the trial judge had power to entertain the company's application in order to determine the judicial question as to the nature and extent of the power of the common council, but that he erred in holding that the common council had no power to make the order complained of.

Argued April 28th—decided June 2d, 1908.

APPEAL from the refusal of the city of New London to approve the plan and method submitted by the Railroad Company for the erection and maintenance of an overhead electric transmission line in the streets of said city, taken to and tried by the *Hon. Joel H. Reed*, a judge of the Superior Court, upon the city's motion to dismiss the appeal; judgment rendered in favor of the Railroad Company, from which the city appealed. *Error and cause remanded.*

*John C. Geary*, for the city of New London.

*Benjamin I. Spock*, for the New York, New Haven and Hartford Railroad Company.

HAMERSLEY, J. The proceeding before *Judge Reed* in which the judgment appealed from was rendered is an application by the New York, New Haven and Hartford Railroad Company, being a street-railway company (hereinafter called the plaintiff), asking that the action of the mayor and court of common council of the city of New London (hereinafter called the defendant), in making an order for preserving in a safe condition for public use the highways for whose maintenance in a safe condition the

city is charged by law as the agent of the State for that purpose, may be revoked, because the action complained of is illegal, without authority of law, and injurious to the rights and property of the plaintiff. The application is an original process, called "appeal," for invoking the exercise of judicial power, and is made to a judge of the Superior Court sitting in chambers in the exercise of the judicial power vested in that court. *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 599–602, 37 Atl. 1080.

The reasons for appeal assign three errors; they are in substance two: First, in holding that the defendant had no power to make the order complained of; second, in holding that the Superior Court, or a judge thereof in chambers, could entertain an application for determining the question of power, before the subject-matter of the order had been passed upon by the railroad commissioners. If either assignment of error is well taken, its determination finally disposes of this case; but the errors are so related that it is impracticable to thoroughly discuss the grounds on which any one assignment can be sustained without, in a measure, determining all.

The plaintiff has authority from the legislature, for the purpose of operating an electric railway, to generate electricity, and, for the purpose of using and applying the same as a motive power for the operation of its railway, to transmit electricity from the place of generation to the place where it is to be so used and applied, and in such transmission to place electric wires and conductors over, on, or under any highway, having first obtained consent of owners of land abutting on the highway, and such placing being subject to the full direction and control, including the relocating or removal of the same, of the cities or other agents of the State charged with the duty and invested with the power of protecting the public safety against the dangers incident to the use of the highways for such wires and conductors. 14 Special Laws, pp. 706–711. The precise controversy between the plaintiff and defendant is this: The defendant claims that, in the exercise of its power of

full control and direction, it has the power to order such electric wires and conductors to be placed in conduits under the highways. The plaintiff claims that it alone is authorized to decide whether such wires and conductors shall be placed over or under the highways, and that neither the city nor any other agent of the State charged with protecting public safety in the use of the highways has any power to direct that these electric wires and conductors shall be placed under ground.

A determination of this question depends upon the meaning of existing legislation relating to highways, to the duties and powers of the agents of the State charged with their maintenance and with the protection of the public in their use as highways, and to their occupation in aid of some public use other than that of a public highway. The existing law as contained in the Revision of 1902 is to be found under various heads of legislation, sometimes covering in a little different form the same ground and all intended to give effect to substantially the same public policy. This law is the result of distinct but closely related lines of legislation. One fixes the general rule of policy, namely, that towns, cities, and boroughs shall be charged with the burden of maintaining public highways and invested with the power of protecting the public safety in their use. This policy was recognized in 1672 (Laws of 1672, p. 7) and has remained substantially unchanged. Rev. 1902, §§ 2013–2089.

Shortly after the invention of the telegraph, lines of telegraph were recognized as furnishing such public advantages as justified some use of the highway in aid of such a public use. In 1846 a company was chartered to construct and use lines of telegraph under the Morse patents. 4 Private Laws, p. 1212. In 1848 special provisions were made for the incorporation of telegraph companies, and such companies were authorized to condemn private lands and to use highways for their necessary fixtures, provided the same shall not be so constructed as to incommode the public use of said highways. In

1849, recognizing such use of the highway as an additional servitude on the land of the adjoining owner, it was provided that no telegraph company could place any post, etc., on the highway, without consent of the adjoining owner, and also provided for taking the right by condemnation, if such consent were refused; and in 1853 these privileges in the construction of telegraph lines were extended to all associations and persons who should extend lines from beyond the State to any point within the State. Comp. 1854, pp. 210–213. In 1860 the privileges in the construction of telegraph lines were recognized as extending to all owners of telegraph lines, foreign and domestic; provision was also made for the removal of any poles which might become an annoyance to the public in the use of the highway or to an individual in the use of his property, and specific power was given to cities and boroughs to compel companies to furnish such poles of the style and finish as the municipal authorities might determine, and provisions were also made for the appraisal of damages to which any person might be entitled by reason of such use of the highway. Public Acts of 1860, p. 52, Chap. 66. The foregoing provisions were substantially incorporated in the Revision of 1866, p. 208, under the heading "Telegraph Companies," and the same provisions were incorporated in the Revision of 1875, p. 341, under the same heading.

In 1879 the existing law, being part of chapter 2 of title 17 of the Revision of 1875, was amended by adding after the word "telegraph," wherever the same may occur, the words "or telephone." Public Acts of 1879, p. 381, Chap. 36. In 1881 an electric light company was authorized to make and sell electric light and electricity, and in 1882 a telephone company was chartered. 9 Special Laws, pp. 212, 605. Subsequently a "Light and Power Company" was chartered, authorized to make and sell electricity for light and power; and from 1885 to 1889 a large number of electric light companies were chartered. 10 Special Laws, passim. In 1884 an Act provided that

every person who shall place any telegraph or telephone pole in, upon, or over any highway without the consent of the adjoining owner (or condemnation proceedings), or who shall wilfully injure any tree in such highway for the purpose of maintaining therein any telegraph or telephone fixtures, without consent of adjoining owner, shall be fined or imprisoned. Public Acts of 1884, p. 376, Chap. 96. In 1883 an Act provided that no telegraph, electric light, or telephone company shall cause to be injured any tree growing on the highway, for the purpose of constructing or maintaining therein any telegraph or telephone fixtures or wires, without consent of adjoining owner, under penalty of a fine for each offense. Public Acts of 1886, p. 617, Chap. 118.

The law as thus established was as follows : The public use for which highways were established did not include their use for telegraph or telephone lines. Telegraph and telephone lines were treated as of sufficient benefit to the public to justify a limited use of the highway and the condemnation of private rights for such a public use. Every telegraph and telephone company was authorized, in the construction of its line, to use any highway in such way as not to incommode public travel nor injure private property without the owner's consent. Every telegraph or telephone pole which became an annoyance to the public in the use of the highway was treated as a nuisance, subject to removal. The municipal authorities of cities and boroughs could compel the use of such poles as they might prescribe. No telegraph or telephone company could place any pole or fixture in or upon any highway, without consent of the abutting landowner or a condemnation of his right. Provisions for such condemnation were made. The placing of any telegraph or telephone pole, and other injury to private property, in violation of these provisions was made a criminal offense.

In 1887, by " An Act concerning Electric Companies " (Public Acts of 1887, p. 676, Chap. 33), the legislature classed lines for the distribution of electric light and power

with telegraph and telephone lines as serving a similar public use and so entitled to the same restricted privileges in the use of public highways ; and under the common name of "electric companies" gave to the owners of all such lines the same privileges, under the same restrictions, in the use of highways.  The great increase of such lines, and the still greater increase impending, called for more specific and stringent regulations, in support of the recognized municipal control of highways, that should make clear the municipal power of directing the placing of these multiplied wires and dangerous conductors either over or under the highway, as they should deem the convenience and safety of the public in the use of the highway required.  The only distinction made between these so-called "electric companies" is that every telegraph and telephone company organized under the joint stock law may be entitled to the powers and privileges enumerated in the Act, but no electric light or power company so organized shall be so entitled, without special authority from the General Assembly.  Section 1 of the Act, in connection with §§ 3 and 4, applies to all electric companies the existing provisions in respect to telegraph and telephone companies for the protection of an abutting landowner against placing in the highway, by any such companies, any of their structures or apparatus, without his consent or a condemnation of his right.  Section 1 is as follows: "No telegraph, telephone, or electric light company or association, nor any company or association engaged in distributing electricity by wires or similar conductors, or in using an electric wire or conductor for any purpose, may hereafter exercise any powers which may have been conferred upon it to erect or place wires, conductors, fixtures, structures, or apparatus of any kind over, on, or under any highway or public ground or to change the location of the same, without the consent of the adjoining proprietors, or, in case such consent cannot be obtained, without the consent in writing of two of the county commissioners of that county, which shall be given only after a hearing upon due notice to such proprietors,

and the fees of such commissioners shall be paid by such company." Section 2 of the Act recognized and established full municipal control of the highways as the fundamental condition upon which any use of them for the structures of electric companies is permitted. Section 2 is as follows: " The selectmen of any town, the common council of any city, and the warden and burgesses of any borough, shall, subject to the provisions of the preceding section, within their respective jurisdictions, have full direction and control over the placing, erection, and maintenance of any such wires, conductors, fixtures, structures, or apparatus, including the re-locating or removal of the same, and including the power of designating the kind, quality, and finish thereof, and may make all orders necessary to the exercise of such power of direction and control, which orders shall be in writing and recorded in the records of their respective communities, but shall be subject, nevertheless, to the right of appeal by said company to a judge of the superior court, who, after a hearing, upon due notice to all parties in interest, shall as speedily as possible determine the matter in question, and affirm, modify, or revoke said orders." Sections 9 and 10 of the Act amend the Acts of 1884 and 1886 imposing penalties for unauthorized placing of structures in the highway, so as to include every " telegraph, telephone, electric light or power company."

The law as established by the Act of 1887 is included, unchanged, in the Revision of 1888, under the chapter dealing with " Telegraph, Telephone, and Electric Light or Power Companies " (§§ 3943–3954) ; and is included, unchanged, in the Revision of 1902, under the chapter dealing with " Telegraph, Telephone, and Electric Light or Power Companies " (§§ 3903–3916); and is the law in force to-day.

In view of this legislation, we think it clear that the full direction and control given to municipal authorities over the use of highways, and especially in § 2 of the Act of 1887, being § 3905 of the Revision of 1902, includes the power to direct any telegraph, telephone, or electric light

company, and any company engaged in using electric wires or conductors, to place under ground such wires or conductors as may be used within the limits of a highway.

The defendant, however, claims that its power in respect to the wires and conductors which the plaintiff desires to place in the highways is not only derived from the general municipal control of highways to be found in the chapter of the General Statutes dealing with highways (§§ 2012–2089); and from the specific power over highways to be found in the chapter dealing with "Telegraph, Telephone, and Electric Light or Power Companies" (§§ 3903–3916); but is also derived from the specific power over highways to be found in the chapter dealing with "Street Railway Companies" (§§ 3823–3875). And this suggests the consideration of another line of legislation closely related to and covering some of the same ground as those we have already considered. Shortly prior to 1860 the use of the tramway as an appropriate means of facilitating the public use of highways became a practical question. In 1859 the first horse railroad company was chartered. It was given the powers given by law to (steam) railroads, was authorized to lay its tracks along highways, but only with consent of the towns having charge of the highways, and to transport persons and property by use of motive power other than steam, and was given the right of eminent domain (5 Private Laws, p. 306); and within the next five or six years nine other companies were chartered, with varying provisions in each charter. Unlike telegraph lines, horse railroads were treated as not necessarily imposing a new servitude on the highway in which they might be laid, and, therefore, as not, generally, requiring the assent of abutting owners, or a condemnation of such owners' rights, before the tracks could be laid. Canastota Knife Co. v. Newington Tramway Co., 69 Conn. 146, 36 Atl. 1107. They did, however, involve a peculiar and new use of the highway for the profit of private persons and more or less inconsistent with use by the general public. And so from the beginning the general municipal

control over highways was recognized as including control over the methods of this peculiar use. Ordinarily the charter of each company contained some provisions requiring the assent of towns in some form before such tracks could be laid, and the towns could, and in some instances did, give this assent upon conditions which secured their control. The first statutory regulation was contained in "An Act relating to Horse Railroads," which gave to towns the power to prescribe the forms of rails, and some other matters, and required each railroad company to keep in repair certain portions of the highway, giving to the towns power to enforce such duty. Public Acts of 1863, p. 22, Chap. 31. In 1864 all horse railroad companies were forbidden to use steam for motive power. Public Acts of 1864, p. 37, Chap. 21. In 1865 an Act prescribed the same rules in respect to petitions for incorporation of horse railroad companies as in cases of (steam) railroad companies; required annual reports to the General Assembly, and declared that no horse railroad company hereafter chartered should have power to lay its rails upon any highway, except in such manner and under such restrictions as the municipal authorities may impose, giving to any such company a right of appeal to the Superior Court. Public Acts of 1865, p. 98, Chap. 102.

The law as thus settled was incorporated in the Revision of 1866, pp. 181, 206, under the general heading of " Railroads " and special heading " Of Horse Railroads." Its main features are, briefly, these : No condemnation of rights of abutting owners in the highway as a necessary condition precedent in every case to laying the tracks. No tracks shall be laid in any highway, except in such manner and under such restrictions as municipal authorities may impose, but an aggrieved company may appeal to the Superior Court. Every railroad company shall keep a prescribed portion of the highway in repair. No company shall use steam as a motive power.

In 1873 municipal authorities were authorized to permit the use of any improved motive power, or motor (except

steam), for the traction or propelling of street-railway cars, subject to such restrictions, regulations and conditions as said local authorities may impose, and subject to revocation, at any time, in the manner specified by the authority granting the same. Public Acts of 1873, p. 128, Chap. 8.

The law as stated in the Revision of 1866 and modified by the Act of 1873 was incorporated substantially unchanged in the Revision of 1875, p. 339, in the article entitled "Horse Railroads," being the third article in the part dealing with railroad companies; and the same provisions, substantially unchanged, were included in the Revision of 1888, §§ 3594–3602, under the title dealing with "Railroads" and the chapter in said title dealing with "Horse Railroads."

Prior to and including the year 1893, the use of electricity as a motive power, and the number of chartered street-railway companies, greatly increased. In that year, for the purpose of securing uniformity in the treatment of all street-railway companies, of extending and enforcing the existing law as to municipal control, and of bringing street-railways to some extent within the supervision of the railroad commissioners, the important sections of the Revision of 1888 were repealed and re-enacted with additional provisions in an Act entitled "An Act concerning Street Railways." Public Acts of 1893, p. 307, Chap. 169, p. 395, Chap. 240. And an Act was also passed authorizing any railroad company, including steam railroads and horse railroads, to operate its railroad by electricity, in addition to the motive power already employed. Public Acts of 1893, p. 351, Chap. 193. The Act concerning street-railway companies was in § 17 expressly made an amendment to the charter of all existing railway companies (except steam railroads), and it was expressly provided that all such railway companies hereafter chartered should be subject to the provisions of the Act. The provisions of the existing law authorizing municipalities to permit the use of electricity, subject to such regulations and conditions as they might prescribe, and to prescribe the condi-

tions upon which any railway company should lay its tracks upon a highway, were re-enacted in different parts of the Act, and especially in § 2. Under this section the power of the municipality to modify any proposed plan for the use of its streets extended to the motive power to be used and the method and manner of applying it, and included the power of requiring electric wires to be placed under ground when necessary to protect the ordinary uses of the highway. *Central Ry. & Electric Co.'s Appeal,* 67 Conn. 197, 211, 35 Atl. 32. But the extent of municipal control implied in § 2 and other parts of the Act is made more clear, specific and complete by the provisions of § 3. The language of this section substantially follows that of § 2 of the Act of 1887 concerning electric companies, as incorporated in § 3946 of the Revision of 1888, and the full " direction and control," given by the last mentioned section, over the placing of any electric wires and conductors by any electric company, or any company using an electric wire or conductor for any purpose, is also included in the " exclusive direction " over the placing of any wires or conductors by any street-railway company, given to municipal authorities by § 3 of the Act of 1893.

We think, therefore, that whether we look to § 2 of the Act of 1887 concerning electric companies, now in force as § 3905 of the Revision of 1902, or to § 3 of the Act of 1893 concerning street railways, now in force as § 3824 of the Revision of 1902, the placing of electric wires and conductors in a highway by a street-railway company, for the purpose of applying electricity as a motive power for the operation of its railway, is subject to the direction of the local municipal authority, which may direct that such wires and conductors shall be placed under ground or overhead. We think this interpretation is justified by the language used in the statutes mentioned, especially when such language is read, as it must be, in the light of all the legislation determining the purpose, use and control of highways, and of the established public policy as to the use of highways which that legislation plainly indicates and which the legis-

lature intended to enforce through the enactment of the statutes in question.

The plaintiff claims that it is exempt from this municipal control by force of an Act amending its charter, and especially by force of § 3 of that Act. 14 Special Laws, p. 706. That section is as follows : " Sec. 3. The said corporation whose charter is herein amended is hereby authorized and empowered to acquire and develop water powers for the generation of electricity, and to construct and acquire or hold, use, and operate plants for the generation of electricity by means of water power or steam or both or by any other means, and also to establish and maintain upon any private lands, and across, over, or under any streams or waters, and, subject to the provisions of sections 3904, 3905, 3906, and 3907 of the general statutes, along or across and upon, above, or under the streets, highways, and public grounds upon which it shall lawfully operate an electric railway, or which shall form a part of its route adopted for the transmission of electricity from any place where it is generated or developed to any part of any lines of railroads or railways where such electricity is to be used or applied, suitably constructed and supported conductors, including lines of poles and wires and underground conduits and wires, and properly supported cables, and including all proper fixtures and appurtenances, and also to transmit therewith, thereby, or therein electricity in such manner and of such quantities and pressures as said corporation shall find necessary for the best conduct of its business." The plaintiff's charter purports to authorize it to operate the lines of some twenty-four chartered street-railway companies through the highways mentioned in these charters and upon a multitude of other specified highways, and for the purpose of operating such lines of railways to establish, anywhere within the State, plants for the generation of electricity, and to transmit by wires and conductors the electricity so generated to any part of any line of railway where such electricity is to be used or applied, and to place these wires or conductors across or along all streets and

highways within the line of transmission. The claim is, that in granting this charter, the legislature has enacted a law which authorizes this plaintiff to use the highways indicated, which may include every highway within the limits of the State, for the maintenance of electric wires and conductors, and to place these conductors of electric power, at its own will, either over or under the highway, uncontrolled in the exercise of its will by the authority of municipalities, or of the railroad commissioners, or of any agent of the State. This claim is unfounded. The power given in the plaintiff's charter, to construct and operate street-railways, is given subject to all general laws governing the construction of railways in highways, and the power given in § 3, to use highways in the transmission of electricity, is only given subject to the provisions of § 3905, establishing the exclusive direction of the municipality in the mode of placing the wires and conductors for such transmission. The language of the charter, with its reference to the General Statutes, indicates the legislative intent that the municipality or other agent of the State, and not the plaintiff, shall determine whether the electric wires and conductors occupying a highway shall be placed under or over the surface of the highway.

The rapid and marvelous increase in the use of street railways, especially in their adaptation to through travel, which followed the legislation of 1893, indicated the necessity of additional legislation directed chiefly to two objects. First, to place street-railway companies, as well as steam railroad companies, under the supervision and control of the board of railroad commissioners in respect to their operation and fulfillment of their duties to the public. Second, to make the existing control belonging to municipalities in the use of highways by street railways subject to the ultimate and supreme authority of the railroad commissioners. These objects were sought to be accomplished in "An Act concerning the Railroad Commissioners." Public Acts of 1901, p. 1330, Chap. 156. Sections 1, 2, 12, 14 and 15 of the Act are directed to the former object;

and the remaining sections to the latter object. The Act was both consistent and inconsistent with much existing legislation, and did not attempt to specify the legislation which was impliedly repealed and that which was left in force. Some light is thrown on this question by the Revision of 1902, in which the Act of 1901 is incorporated, together with other prior legislation, especially in the Act of 1893, covering the same ground. We had occasion to consider the Act of 1901 and its effect upon the Act of 1893, and to determine its construction in certain particulars, in *Hartford* v. *Hartford Street Ry. Co.*, 75 Conn. 471, 53 Atl. 1010. As the law now stands the control of the use of highways for street railways as it existed prior to 1901 remains undiminished; the municipal authorities are still the agents of the State in the exercise of that control, but jointly with the railroad commissioners, who in some particulars exercise the control through original and exclusive action, and may exercise it in all particulars either through original or appellate and final action. Whatever doubt may arise in some cases whether the municipality can act in the first instance, or in the absence of action by the railroad commissioners, we think it clear that it may so act in a case like the one before us; that is, the local authorities may, in the absence of action by the railroad commissioners, exercise the full direction and control given by statute in respect to placing electric wires and conductors in the highways by a street-railway company for the purpose of transmitting and applying electricity as the motive power for operating its railway, subject, however, to final action of the railroad commissioners.

There is another consideration affecting the legislation of 1901, especially as applicable to the present case. The judicial power vested in the Superior Court extends to the protection of rights of person or property that may be invaded by executive officers or administrative boards in the unlawful exercise of administrative powers conferred upon them. The power of the court for this purpose may be invoked through any appropriate process authorized by

our common or statute law. For many years our law has recognized a peculiar and informal process for invoking this power, called "appeal." The process has never been formally recognized as one applicable to every case where its use may seem appropriate, but it has been specially authorized in many cases, covering most of the instances where important legislative or executive functions have been conferred on administrative boards. During the colonial period of our government all power was vested in the General Court or Assembly, and every exercise of power by subordinate officers or tribunals could be reviewed by an appeal to the General Court; and subordinate courts and tribunals exercised both judicial and administrative power which might, in some instances, be invoked by appeal from acts of executive officers. This condition continued until 1818, when our Constitution, which distributed the powers delegated by it to three distinct and separate departments of government, was adopted; but after the adoption of the Constitution the informal process of appeal was retained as a convenient means, in certain cases, of invoking the judicial power, and occasionally the law authorizing this process purported, also, to impose upon the court legislative or administrative duties. Such an Act was that of 1895, which authorized the process of appeal for invoking the judicial power 'in protection of 'rights of property invaded by the unlawful exercise of the administrative power vested in city councils in respect to street railways by the Act of 1893, and further purported to authorize the Superior Court to exercise all the purely legislative and administrative powers conferred upon the city councils. Public Acts of 1895, p. 630, Chap. 283. We held that so much of this Act as purported to confer upon the Superior Court powers essentially and merely legislative was inoperative. *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 37 Atl. 1080; *Malmo's Appeal*, 72 Conn. 1, 4, 43 Atl. 485. At the session of the legislature following the last of these decisions the Act of 1901, above considered, was passed. In connection with one

main purpose of that Act, *i. e.* to secure more uniformity in the regulations of the use of highways by street railways, the Act of 1895 was repealed, and § 5 of the Act of 1901 provided for an appeal from any decision, denial, order, or direction of local municipal authorities with respect to any matter relating to street railways, to the railroad commissioners; and upon such an appeal the commissioners tried, *de novo*, all matters brought before them, and determined the administrative questions involved. *Hartford* v. *Hartford Street Ry. Co.*, 75 Conn. 476, 53 Atl. 1010. And in order to retain the process of appeal for invoking the judicial power as authorized by the Act of 1895, § 8 of the Act of 1901 authorized an appeal from any action of the railroad commissioners, either original or appellate, in the manner provided under the provisions of § 3518 of the Revision of 1888. The section referred to was construed in *Spencer's Appeal*, 78 Conn. 301, 61 Atl. 1010, and was held to authorize a process for invoking the power of the Superior Court for protection against action of the railroad commissioners unauthorized in law or based upon a misconception by the commissioners of the law or of their powers and duties, but that the portions of the section imposing upon the court the strictly administrative duties of the commissioners were inoperative. These provisions of the Act of 1901 appear in the Revision of 1902 as §§ 3832 and 3834.

We think the intent of the legislature expressed in these sections, in connection with other sections relating to the same subject-matter, and especially in connection with § 2 of the Act of 1887 (now § 3905, Rev. 1902), so far as it affects the case before us, is that any action authorized with respect to any matter relating to street railways, that shall be taken by local municipal authorities, may be retried and determined by the railroad commissioners, and that one injured in his legal rights by unlawful action (whether of the municipal board or of the board of railroad commissioners) in the exercise of the specified administrative powers, may apply to the Superior Court, or

a judge thereof sitting in chambers, through the original process called "appeal," for such appropriate relief as comes within the judicial power vested in the court, and this process runs against the municipal board when the actual injury complained of results from the unlawful action of that board. But, as was said in *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 37 Atl. 1080, and *Spencer's Appeal*, 78 Conn. 301, 61 Atl. 1010, the statute does not transfer the purely legislative and administrative powers or duties, either of the city council or of the railroad commissioners, to the Superior Court for performance by that court. In such matters the action of the board charged with their performance is final.

In the present case, the actual injury complained of resulted from an order made by the common council in the exercise of its power of regulation, which the plaintiff claims is, as to itself, unlawful, and an injurious invasion of its legal rights, whether made by the common council or the railroad commissioners.

It follows that the trial judge did not err in entertaining the plaintiff's application, but did err in holding that the common council had no power to make the order complained of, and erred in not rendering judgment that the defendant recover its costs.

There is error, the judgment appealed from is reversed and the cause is remanded in order that the trial judge may render judgment for the defendant in accordance with this opinion.

In this opinion the other judges concurred.