THE STATE, THE INHABITANTS OF THE TOWN OF PHIL-
LIPSBURG ET AL., PROSECUTORS, v. BOARD OF PUBLIC
UTILITY COMMISSIONERS AND THE PHILLIPSBURG
HORSE CAR RAILROAD COMPANY.

Argued June 3, 1913—Decided December 4, 1913.

1. An order of the public utility commissioners directing a change
   of gauge of the tracks of the Phillipsburg Horse Car Railroad
   Company, is within the jurisdiction of the commissioners, under
   the provisions of the Public Utility act. *Pamph. L.* 1911, *p.* 378.
2. The power conferred upon the town of Phillipsburg to regulate
   the exercise of the franchise of the railroad company within the
   town is in the nature of a police power which may be modified
   or repealed by the legislature as public expediency may require.
3. The fact that the town in the exercise of the power to regulate,
   passed an ordinance which the railroad company accepted as a
   condition upon which it might exercise its franchise, does not
   constitute a contract which the town can interpose as a barrier
   to the exercise of its general police power in the supervision of
   street railways.
4. The state by conferring upon the municipality the power to reg-
   ulate street railways, does not thereby deprive itself of the
   power by vesting general jurisdiction of the subject-matter in a
   state board, and conferring upon it ample powers to that end
   even though the effect may be, so far as the municipality is
   concerned, to revoke the powers conferred upon it, by prior
   legislation.

On *certiorari.*

Before Justices GARRISON, TRENCHARD and MINTURN.

For the prosecutors, *J. I. Blair Reiley.*

For the railroad company, *W. H. Walters* and *Henry J.
Steele,* of the Pennsylvania bar.

For the board of utility commissioners, *Frank H. Sommer.*

The opinion of the court was delivered by

MINTURN, J. The writ of *certiorari* in this case removes,
at the instance of the town of Phillipsburg, an order of the

public utility commissioners, made on November 19th, 1912, granting to the Phillipsburg Horse Car Railroad Company permission to change the gauge of its tracks from five feet two and one-half inches to the standard gauge of four feet eight and one-half inches.

The order is attacked in the first place upon the ground that the commissioners were without jurisdiction to make it. We consider that the Public Utility act of 1911 (at *p.* 378) confers general and specific authority upon the commissioners to deal with the question. By its terms the board is given general supervision, jurisdiction and control "over all public utilities, and also over their property rights, equipments, facilities and franchises," and power is conferred upon it "to permit any street railway to change its existing gauge to standard steam railway gauge, upon such terms and conditions as said board shall prescribe." . Having exercised the power thus amply conferred to deal with the subject-matter of this controversy, the objection is urged that there was an absence of any evidence upon which the board could reasonably base its finding.

If there was evidence upon which the board could reasonably make the order we are precluded by the express terms of the enactment from reviewing it. *Inter-State Telephone and Telegraph Co.* v. *Board of Utility . Commissioners,* 55 *Vroom* 184.

The facts before the board were contained in a stipulation filed by the parties, which took the place of oral testimony, and this was supplemented by the testimony of the inspector of the commissioners, who in a written report, after investigation, recommended the change of gauge.

The record and testimony thus adduced presented all the necessary facts upon which the commissioners might exercise the jurisdiction conferred upon them.

The railroad company was incorporated under two acts of the legislature (*Pamph. L.* 1867, *p.* 801, and *Pamph. L.* 1868, *p.* 161), under which it was authorized to construct a railroad of a certan gauge in Phillipsburg with the consent of the town. Subsequently the railroad equipped its road

with electricity under an ordinance of the municipality for the purpose, the provisions of which were accepted by the company.

It is now contended by the town in answer to this exercise of jurisdiction by the public utility commissioners, that this ordinance and its acceptance constituted in legal effect a contract between the town and the company, which is protected from impairment by the familiar provisions of the federal constitution.

The concrete inquiry therefore presented by this situation is whether the state by committing to an administrative board the power to regulate the conduct and operation of a *quasi* public corporation can constitutionally change the gauge of street car tracks to accord with what the legislature may conceive to be the public interest, where such gauge under a prior legislative delegation of power to the municipality was fixed by ordinance, the terms of which the company has accepted.

It will be observed in this inquiry that the contractual relationship sought to be sustained is pleaded not by the company, which is not before us as a complaining party, but by a municipal corporation, an arm of the state government, to which the power *pro bono publico* was delegated by the legislature.

It is not perceived how the question of the constitutionality of the acts of the public utility commissioners can enter as between the state and its creature the town, upon a mere proposal not to divest the municipality of any property right, but to transfer from the local municipal body to a general state board the legislative police power of street regulation, in the operation of street car companies, a power inherent in the state and of which it has not even *pro tanto* divested itself by prior temporary delegation to the municipality, to subserve what at the time of the delegation may be conceded to have been a local public interest.

Were we dealing with a contention of this nature pressed by the railroad corporation, other considerations would present themselves, but as between the local body politic and its

creator, the state, the principle is fundamental in our juris-
prudence that the charter of a public corporation is not con-
sidered a contract, and does not come within the doctrine of
the Dartmouth College case. *Dartmouth College* v. *Wood-
ward,* 4 *Wheat.* 518; *Newton* v. *Mahoning County,* 100 *U. S.*
548; *Prirce* v. *Crocker,* 166 *Mass.* 347; *Paterson* v. *Society
for Establishing, &c.,* 4 *Zab.* 385.

As was said in an early case in the history of constitu-
tional construction: "It is an unsound and even absurd
proposition that political power conferred by the legislature
can become a vested right as against the government in any
individual or body of men." *People* v. *Morris,* 13 *Wend.*
325.

In the case of *East Hartford* v. *Hartford Bridge Co.,*
10 *How.* (*U. S.*) 511, the town was given the right by legisla-
tion to maintain a ferry over the river. Subsequently by
several acts the state first granted one-half of the ferry privi-
lege to an adjoining town, and finally provided for the en-
tire discontinuance of the ferry. The town of East Hartford
contested this legislative procedure, upon the ground that its
constitutional rights were thus invaded. The United States
Supreme Court, in declining to accede to that view, said:
"The doings of the legislature as to this ferry must be con-
sidered rather as public laws than as contracts. They related
to public interests. They changed as those interests de-
manded. The grantees, likewise the towns, being mere or-
ganizations for public purposes were liable to have their
public powers, rights and duties modified or abolished at any
moment by the legislature."

To the same effect is *Mulcahy* v. *Newark,* 28 *Vroom* 513.

It is to be observed also that the power thus conferred
upon this prosecutor, quite manifestly was that of police
regulation, being concerned with the control and regulation
of its streets in the interest of the traveling public.

The contention, therefore, that such a power once con-
ceded by the legislature to the municipality is incapable of
modification or revocation is conspicuously opposed to the
fundamental doctrine that the police power of the state can-

not be aliened even by express grant. *Thorpe* v. *Railroad Co., 27 Vt.* 149; *Boston Beer Co.* v. *Massachusetts, 97 U. S.* 25; *Vanderbilt* v. *Adams, 7 Cow.* (*N. Y.*) 349; *Cooley Const. Lim.* 345.

That the power thus inalienably possessed by the state may be delegated in the interest of the public weal, to such subordinate agency as public expediency may in legislative contemplation dictate, is a doctrine equally fundamental. *State* v. *Tryon, 39 Conn.* 183; *Com.* v. *Plaisted, 148 Mass.* 375; *Village of Carthage* v. *Frederick, 122 N. Y.* 268.

That the change of gauge ordered by the commissioners was not intended to change the legal *status* of the railroad, or vary its obligations to the municipality under the provisions of any special statute applicable to it is manifest from the terms of the order that it "shall not be construed to enlarge otherwise its present rights or narrow its present legal obligations in any respect whatever."

These considerations render it manifest that the order of the commissioners must be affirmed.