## THE CONNECTICUT COMPANY *vs.* THE CITY OF NEW HAVEN ET ALS.

Third Judicial District, New Haven, June Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

The general rule of policy in Connecticut from early times has been that towns, cities and boroughs shall be charged with the burden of maintaining highways and given the power of protecting the public in their use.

The charter power of the city of New Haven to "make, repair and keep open and safe for public use and travel all streets and highways" is a delegation of a part of the general police power of the State which resides in the General Assembly; and, like all express grants of power, it carries with it not only those powers which are necessarily implied, but also those which are indis-

pensable to the attainment and maintenance of the objects declared in the grant.

The statutes which define the powers and duties of the Public Utilities Commission are remedial in character, and are to be construed liberally to effect their purpose, which is to bring the manifold and far-reaching activities of public service corporations under unified control to be exercised by an administrative body, so organized as to possess the means and facilities, necessarily lacking in the courts, the General Assembly, or the several municipalities, of adopting and then applying a general policy whereby the lawful operations of such corporations and the public needs of the communities which they serve shall be properly correlated.

It is inevitable that in the accomplishment of this desirable object the powers of the commission shall frequently invade and supersede certain functions which, before its creation, were generally recognized as being within the exclusive jurisdiction of municipalities.

Under the existing statutes, there are but few instances—and these are purely local in character, such as traffic rules—where municipalities have jurisdiction, either exclusive or concurrent with that of the Public Utilities Commission, to make regulations in the exercise of the police power concerning the operation or equipment of street railways.

The city of New Haven passed an ordinance forbidding the operation of so-called "one-man" trolley-cars between designated hours upon certain of its streets, declared to be arterial and special traffic highways. *Held* that the city was without power to thus regulate the number of operatives upon street cars, since matters of such a general nature connected with the manner of their operation, were placed by the several statutes relating to the Public Utilities Commission, and especially by § 3621 of the General Statutes, within its exclusive jurisdiction.

Argued June 3d—decided July 30th, 1925.

Suit for an injunction to restrain the enforcement of an ordinance forbidding the operation of so-called one-man trolley-cars on certain designated highways in the city of New Haven, brought to the Superior Court in New Haven County and tried to the court, *Wolfe, J.;* judgment for the plaintiff, and appeal by the defendants. *No error.*

*George W. Crawford,* with whom, on the brief, was *Thomas R. Robinson,* for the appellants (defendants).

*George D. Watrous* and *Seth W. Baldwin,* for the appellee (plaintiff).

WHEELER, C. J.   The complaint alleges the enactment by the city of New Haven of an ordinance declaring certain designated streets to be arterial and special traffic highways, and providing that no corporation shall operate, upon these streets, cars carrying passengers between designated hours unless the cars shall have thereon, in addition to the motorman, a conductor or other servant to assist in the care and control of the car and its passengers, and providing a penalty for the violation of the ordinance; it also alleges the fact that plaintiff operates by one man only, one-man cars, so-called, over its lines in these streets, and that defendants intend and threaten to enforce this ordinance and prosecute plaintiff or any who shall operate any street car in violation of its provisions.   A further allegation of fact appeared as paragraph five of the complaint: "The enforcement of said so-called ordinance would not only impose a very heavy financial burden upon the plaintiff, but seriously interfere with the conduct of its business in public service, and cause irreparable loss, for which it has no adequate remedy at law."   The plaintiff claimed, upon these allegations, an injunction restraining each of the defendants, and each of their servants and agents, from arresting any person for violation of this ordinance, or attempting in any way to enforce it.   All of the allegations of fact were admitted except paragraph five, to which defendants specially pleaded, "it is admitted that the enforcement of the ordinance in question will substantially increase the expenses of the plaintiff in the

operation of its trolley-cars in the city of New Haven, and that for the recovery of any loss resulting from said increase in expenses, the plaintiff has no adequate remedy at law," but the remainder of the paragraph was denied.

Plaintiff moved for judgment upon the pleadings, and the court, upon hearing had upon the motion, found the issues for the plaintiff and rendered judgment enjoining defendants from in any manner attempting to enforce, as against the plaintiff or any of its employees, the provisions of this ordinance.

The record is silent as to whether or not the Public Utilities Commission had acted upon the subject-matter of this ordinance—the prohibition of the operation of passenger-cars upon the streets of New Haven by one operator. We may therefore assume that action of this character had not been taken by the commission. In this condition of the record two assignments of error include all the questions whose decision are required by this appeal: (1) that the ordinance is not within the scope of the municipal police powers of the city of New Haven; (2) that the Public Utilities Commission has exclusive power and authority to enact police regulations affecting the use by street cars of the streets of New Haven.

The city of New Haven possesses, under the charter granted it by the State, "not only the powers expressly granted, and those which may be necessarily implied in or incident to these, but also all which are indispensable to the attainment and maintenance of their declared objects and purposes." *Central Railway & Electric Co.'s Appeal*, 67 Conn. 197, 214, 35 Atl. 32. Under our policy, in existence for many years, New Haven, as well as all other municipal corporations of the State, is charged, as the agent of the State, with the maintenance in a reasonably safe condition of its

streets. *New York, N. H. & H. R. Co.'s Appeal,* 80 Conn. 623, 70 Atl. 26. Under the charter of New Haven, § 137 (f), authority was given the board of aldermen "to make, repair . . . and keep open and safe for public use and travel . . . all streets and highways." "The general police power of the State resides in the General Assembly." *New York, N. H. & H. R. Co.* v. *Bridgeport Traction Co.,* 65 Conn. 410, 430, 32 Atl. 935. It delegated a part of its power to the city of New Haven, in the charter granted; *Donnelly* v. *New Haven,* 95 Conn. 647, 654, 111 Atl. 897; and with the grant was delegated such part of the State's police power as was essential to carry out the purposes of the grant. Since the police power of the State embraced, among other things, regulations designed to promote the public safety, and the maintenance of the streets of New Haven in a reasonably safe condition was among the duties imposed upon and accepted by it in the charter granted, with this duty necessarily was delegated the power of exercising the State's police power through whatever regulations were necessary to maintain its streets in a reasonably safe condition. In *New York, N. H. & H. R. Co.'s Appeal,* 80 Conn. 623, 635, 70 Atl. 26, we trace the history of legislative control over our street railways through Chapter 193 of the Public Acts of 1893, and say: "Under this section [§2] the power of the municipality to modify any proposed plan for the use of its streets extended to the motive power to be used and the method and manner of applying it, and included the power of requiring electric wires to be placed under ground when necessary to protect the ordinary uses of the highway." Under its general police power and under the sections of its charter which in part we have quoted, which specifically confer upon New Haven the power of enacting police reg-

ulations over the use of its streets by street railways, we think the city of New Haven had the power in 1893 of enacting the police regulation contained in the so-called one-man car ordinance, provided it were reasonable. Continuing our review of the regulation of street railways in *New York, N. H. & H. R. Co.'s Appeal, supra,* we say (p. 637): "The rapid and marvelous increase in the use of street railways, especially in their adaptation to through travel, which followed the legislation of 1893, indicated the necessity of additional legislation directed chiefly to two objects. First, to place street-railway companies, as well as steam railroad companies, under the supervision and control of the board of railroad commissioners in respect to their operation and fulfillment of their duties to the public. Second, to make the existing control belonging to municipalities in the use of highways by street railways subject to the ultimate and supreme authority of the railroad commissioners. These objects were sought to be accomplished in 'An Act concerning the Railroad Commissioners.' Public Acts of 1901, p. 1330, Chap. 156. . . . As the law now stands the control of the use of highways for street railways as it existed prior to 1901 remains undiminished; the municipal authorities are still the agents of the State in the exercise of that control, but jointly with the railroad commissioners, who in some particulars exercise the control through original and exclusive action, and may exercise it in all particulars either through original or appellate and final action. Whatever doubt may arise in some cases whether the municipality can act in the first instance, or in the absence of action by the railroad commissioners, we think it clear that it may so act in a case like the one before us; that is, the local authorities may, in the absence of action by the railroad commissioners, exercise the full direction

and control given by statute in respect to placing electric wires and conductors in the highways by a street-railway company for the purpose of transmitting and applying electricity as the motive power for operating its railway, subject, however, to final action of the railroad commissioners." It would follow from this construction of the Act of 1901, that the railroad commissioners in some instances exercise exclusive control, and in some instances exercise the control jointly with the municipality; the municipality's control in these instances of joint control being subject to that of the railroad commissioners when exercised, and in some instances, which affect merely the local condition of the municipality, the control of the municipality is exclusive.

The one-man car ordinance is not the regulation of an exclusively local condition. This is plain in the case of a railway operating as the plaintiff does over a wide area and through many communities. Whether the power of regulation of the operation of a railway in the manner proposed by this ordinance would have been, after the legislation of 1901, one within the exclusive control of the railroad commissioners, or one within the joint control of the commissioners and the municipality, we are not required to now determine. If it be the first, the ordinance would be void; if the latter, the ordinance would be good, since the reasonableness of the ordinance is not attacked in this proceeding and the municipality has exercised its control within its police power and prior to the exercise by the railroad commissioners of a like power. In *Cullen* v. *New York, N. H. & H. R. Co.*, 66 Conn. 211, 223, 33 Atl. 910, in an action to recover damages for the closing of a street upon the order of the railroad commissioners, the construction of the then grade-crossing statute was before us, as well as the power of the rail-

road commissioners in the discontinuance of a highway. After quoting § 31 of the charter of New Haven, enacted in 1881, and citing the grade-crossing statute, we say: "These provisions [giving the power of discontinuance to the railroad commissioners] in the general laws control, so far as they apply, the effect of § 31 of the city charter. . . . A steam railroad is a road in the safe maintenance and operation of which the whole State is directly interested. It is therefore put under the supervision of a board of State officers, with extensive powers. Their authority sometimes trenches upon what would otherwise be within the exclusive jurisdiction of some particular municipality, and wherever it does, the latter must give way, for so only could any general policy of administration be carried out. The proper regulation of railroads, in their course through different towns, is a matter which is necessarily of more than local concern. As highways must give place to railroads where both cannot occupy the same ground, so municipal control and management of highways must yield, at times, to State control and management, when safety of railway operation is in question." This principle is equally applicable to the street railway operating through different towns.

The next legislation involving the regulation of street railways was enacted three years after the decision of the *New York, N. H. & H. R. Co.'s Appeal, supra,* and entitled, "An Act concerning the Regulation and Supervision of Public Service Corporations." We stated its origin and purpose and general powers, in *Connecticut Co.* v. *Norwalk,* 89 Conn. 528, 533, 94 Atl. 992, in these terms: "The Public Utilities Act was passed upon the public demand for greater public protection through larger control of and supervision over public service corporations. The Act is broad in its sweep, extensive in the jurisdiction conferred, and far-

reaching in the supervision of public service corporations and the control over public and private interests. It is essentially a remedial statute, and as such . . . is to receive a liberal construction designed to effectuate its cardinal purpose. . . . The Public Utilities Commission succeeded the railroad commissioners, and all the rights, powers and duties heretofore vested in the railroad commissioners, and not inconsistent with the Public Utilities Act, were transferred to and continued in the Commission, and new and enlarged powers were by the Act vested in the Commission."

The strongest testimony to the wisdom of the Act, the public grasp of its originator, and the skill of its draftsman, is found in the fact that few changes have been made in the Act in the fourteen years of its existence and these comprise, in the main, a few procedural changes, and provisions touching rates and the public service devoted to electricity and gas. In General Statutes, § 3864, the commission is given sole and exclusive jurisdiction over the ordering of gates or vestibules enclosing the platforms of cars, and the placing of fenders on such cars. In § 3866, the commission is given authority to order any street-railway company to equip its cars with air brakes or other sufficient brakes. In § 3824, the commission is given exclusive jurisdiction and direction over the method of construction or reconstruction, in whole or in part, of every street railway, as to kind of track, material, etc. In § 3633, the commission is given authority to order a change of poles and wires of any public service corporation. As to the subject-matter of these sections, the authority conferred upon the commission is manifestly exclusive, whether so expressed or not. The reason underlying these specific grants of power is that which led us to the conclusion reached in *Central Railway & Electric Co.'s Appeal*, 67 Conn. 197, 35 Atl. 32.

The charter of New Britain gave its common council power to make such orders as it might see fit, to provide for fenders on electric cars. Later the legislature committed to the railroad commissioners the sole and exclusive jurisdiction to order, whenever they deemed it necessary for the public safety, fenders upon street cars. On an application to extend its tracks the common council imposed the condition that its cars should be equipped with fenders. We held the municipal condition invalid for this reason (p. 217): "Had it [the railway] done so, and after its cars were so equipped, had the railroad commissioners ordered the substitution of fenders of a different style, the company would have been bound in obedience to the law to violate its contract. Should the street committee of the common council require one style of fender, and the selectmen of Plainville or of Berlin, into each of which towns the company's railways extend, require another, it would be necessary either to change cars or to stop and shift the fenders on every trip, upon crossing the city line. It was to prevent the possibility of such conflicts of obligation, that the jurisdiction of the railroad commissioners over this subject was made sole and exclusive. Any existing provisions of charters or by-laws to the contrary were repealed; any future municipal legislation to the contrary was forbidden."

Under § 3632, a town, city or borough may petition the commission that the railway is furnishing inadequate service, and upon due proof secure an order prescribing adequate and suitable plant or equipment. Under § 3634, the same public authority may petition the commission that it make all necessary orders concerning the laying of commercial or industrial side-tracks at grade, upon or across any highway within the limits of such town, city or borough. Under §. 3635, the same public authorities may, on petition

to the commission and proof, secure from it an order prescribing a reasonable rate and service.

These sections show the legislative intent to make the commission the governing body in regulating street railways and in requiring adequate and suitable plant and equipment. The legislature could not itself specifically execute all manner of regulation over public service corporations, which experience might indicate to be of public necessity. There must be a general provision committing to the commission in broad terms the power of exercising the police power. In recognition of this necessity we find, in the Public Utilities Act of 1911, Chapter 128, § 13, now General Statutes, § 3621, this provision: "The commission shall, so far as is practicable, keep fully informed as to the condition of the plant, equipment and manner of operation of all public service companies, in so far as the safety of the public and of the employees of such companies may be involved, and may order such reasonable repairs or alterations in such plant or equipment, or such changes in the manner of operation, as may be reasonably necessary for public safety or for the health or safety of said employees." "Changes in the manner of operation" may well include changes in the number of operatives of the car for the safety of the public. In order, we presume, to cover every possible contingency in the operation of the cars, Chapter 160 of the Public Acts of 1915, now General Statutes, § 3626, was enacted: "The Public Utilities Commission may make regulations controlling the movements, turning, stopping and standing of the cars of street railways within the limits of any town, city or borough where such movements, turning, stopping and standing are not regulated by law." Between these two sections all the police power of the State over streets and highways, not specifically delegated to the commission or

specifically delegated to the municipalities, has been delegated to the commission either exclusively, or jointly with the municipality. Section 3621 was first enacted in the Public Utilities Act. Powers of police over public service corporations could not be exercised by our General Assembly save by a delegation to some other body equipped to administer such functions. The power delegated was that of exercising reasonable regulation and control over public utilities and is based upon the principle announced in *Munn* v. *Illinois*, 94 U. S. 113, 126: "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." Under § 3626, the Public Utilities Commission may make regulations as to the movements of cars when these are not regulated by law. An ordinance of a municipality regulating the movement of cars would be a regulation by law, and hence the power conferred by this section is subject to prior action by the municipality and to appeal to the Superior Court. General Statutes, § 3816, provides that a railway company shall not construct its railway until the local authorities have approved the plan of the same submitted to them, or, on appeal, it shall have been approved by the commission or the Superior Court. And § 3817 provides that the local authorities shall have exclusive control over the placing or locating of tracks, wires, conductors, fixtures or other permanent structures of any such railway in the highways, etc., subject to the right of appeal as provided in § 3816. Under § 3836, the selectmen of any town, the mayor and common council of any city, or the warden and burgesses of any borough, shall have power to make reasonable orders regulating the speed at which

any street railway may run its cars upon any highway. This section does not fix speed, but restricts municipal action.

Section 3836 appears to be the only statutory provision regulating street railways, specifically and exclusively committed to the local authorities, subject, of course, to appeal. "It has been the general policy of the State, throughout its history, to accord to its various municipal corporations a large authority in the regulation of their local affairs." *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 219, 35 Atl. 32. That is still the policy of our State. The growth and development of our public service corporations, the imperative need of their regulation in order to protect and safeguard the public interest, and the incapacity of local authority to properly supervise and adequately protect the public interest, was responsible for the grant, first, of additional powers of regulation over railroads and railways to our railroad commissioners, and, later, for the grant of additional powers of regulation to the Public Utilities Commission. This was a change in the policy of the State toward these public utilities. Regulations of great businesses affected with a public interest touching every institution, every activity, every home and every person in the State must be uniform and must be free from the local judgment and prejudice. Then, too, many of these utilities reached into other communities, and uniformity of regulation by all of these communities would be an unlooked for result. The State could not entrust the ultimate regulation of these utilities to the courts, on appeal from the local authorities. Work of this character is administrative and highly technical, and courts, if they had the legal power to fulfil the functions of a utility commission, would be without the equipment and means of solving its many daily prob-

lems. Such duties and such bodies are administrative and not judicial. The State could not commit the general supervision and regulation of public utilities to local authorities for the added reasons that that would require in each municipality an organization adequate to make the investigation and possessing the technical knowledge to provide for such supervision and regulation. The General Assembly knew this and knew, too, that it was incompetent to perform these daily duties year by year, and that only a public body with adequate power and equipment and means could fulfil these public duties of constantly growing importance to the public interest. It therefore created the Public Utilities Commission. A similar public policy led to the creation in other States at about this time of similar public bodies with similar powers. It was the policy of extending the power of regulation over public service corporations through the police power of the State, delegated by it to a commission or body, for the purpose of exercising a supervisory control over them, in their construction, location, equipment, operation and rates charged. In the elaborate note to *Puget Sound Traction L. & P. Co.* v. *Public Service Co.,* 5 A. L. R. (100 Wash. 329, 170 Pac. 1014) at p. 37, the annotator states, as we find it, the correct rule, and cites many cases in its support: "As a general rule, the power given by statute to public service commissions or similar bodies, to supervise and control street-railway corporations, supersedes the power of municipalities to regulate such corporations, except where specifically preserved to them."

To promote uniformity in the regulation of public service corporations in the interest of the public welfare, safety and convenience; to secure for such regulations obedience and respect like to that accorded the

judgments of a court; to protect all public service corporations in the proper conduct of their business, affected as it is with a large public interest, and to provide an administrative agency with an organization trained and equipped to consider and determine all controversies and problems arising in connection with such corporations and falling within the supervisory and regulatory power of government, the State created our Public Utilities Commission. None of these great interests would be served if each community retained the power of making such police regulations as each might deem proper. And if municipality and commission possessed concurrent power over all police regulations, the result must be conflict of jurisdiction, a weakened public regulation and supervision, and lessened efficiency in public service by these corporations. A public body such as a utilities commission develops standards and an administrative policy which can upon appeal be made to conform to the requirements of law. Neither the public nor the service corporation could tolerate as many standards and policies as there were towns, cities or boroughs through which they operated. Regulating the number of operatives upon a street car is, so far as the corporation is concerned, more of an interference with the business than a regulation requiring a fender upon cars; the latter regulation we found beyond municipal control, since the railroad commissioners had been given like power. For the same reasons we find the legislative intent contemplated the investing, in the commission alone, this power. Over certain matters of police power, wholly local, the State has left with the municipality either original or concurrent jurisdiction. Over regulations not exclusively local, those affecting the business as a whole, or affecting the public as a whole, and those which the nature of the business and the char-

acter of the regulation require should be under the single agency of the State, our Act commits to the exclusive jurisdiction of the Public Utilities Commission. The subject-matter of this ordinance clearly falls within the exclusive jurisdiction of the commission. We cannot by rule determine the classes into which each regulation shall automatically fall. Each instance must be determined as it arises. Under the authority vested in our commission, the instances will be few where either exclusive or concurrent jurisdiction in matters of police are now vested in the several municipalities of the State, and these will be local in character, for example, the traffic regulations of street cars.

In *Portland Ry., L. & P. Co.* v. *Portland,* 210 Fed. 667, 672, the utilities commission was held to have exclusive jurisdiction in the regulating of rates. "That power," the court held, "is vested alone in the Public Service Commission." In *Seattle Electric Co.* v. *Seattle,* 78 Wash. 203, 138 Pac. 892, it was held that the city had no power, after the passage of the statute, to enact an ordinance regulating the number of passengers which a car might carry and the schedule on which the car should be run, as these matters were exclusively within the jurisdiction of the commission.

Defendants cite *Trenton Horse R. Co.* v. *Trenton,* 53 N. J. L. 132, 20 Atl. 1076, in which it was held that the municipality had power to enact an ordinance providing that it should not be lawful for any horse-railway company to run any car without having an agent, in addition to the driver, to assist in the control of the car and passengers. But after New Jersey had created a utility board, it was held in *Phillipsburg* v., *Public Utility Board,* 85 N. J. L. 141, 88 Atl. 1096, that the State, by conferring upon a municipality the power to regulate street railways, did not deprive itself

of the power of subsequently conferring upon a State board the power over the same subject-matter. In *Milwaukee* v. *Railroad Commission,* 182 Wis. 498, 196 N. W. 853, it was held that the order of the railroad commissioners suspended or superseded the ordinance of a city requiring every street car to be operated by two men. These are the only cases, where a similar ordinance was before the court, to which our attention has been directed. Cases in other jurisdictions are affected by their own statutes and their own policy, and for that reason are not authoritative in a case in this State controlled as it must be by our statutes and policy.

We conclude that the Public Utilities Act of 1911, now Chapter 191 of General Statutes, shows, and particularly in § 3621, a legislative intent to place the exclusive jurisdiction over the operation of street railways, aside from mere local traffic regulations, in the Public Utilities Commission.

There is no error.

In this opinion the other judges concurred.